## 32691.  PHELPS *v.* THE STATE.

Decided December 5, 1949.

*S. B. McCall, for plaintiff* in error.

*Edward Parrish, Solicitor-General, William Story,* contra.

Gardner, J.  ■  We will refer to Bill Phelps as the defendant, the female involved as the female. The evidence for the State

substantially shows that the female, between 14 and 15 years old, went with her older sister, who was escorted by a young man friend, to a dance at a warehouse. After the dance, the three of them went to Maluda's, a cafe. On entering the cafe they came in contact with the defendant. Shortly after being served at the cafe, the older sister and her escort concluded to go to some other place for the purpose of meeting a friend of theirs. They left the female at Maluda's, in the charge of the defendant, who promised to take care of her until the older sister and her escort returned. The defendant was a man of approximately 25 years old. After the female and the defendant sat in the cafe for awhile, the female made complaint regarding her older sister not returning. The defendant suggested to her that they would go outside and sit in a car which belonged to a friend of his, where they might the better see and look for the return of the older sister. The car was only a short distance from the cafe. The place where the car was located was well lighted and the female and the defendant could be easily seen by people in and about the front of the cafe. They remained in the car on the back seat for approximately 15 minutes. During this time the defendant attempted to caress the female. She pushed him away and refused him this privilege. She expressed a wish to go home, whereupon the defendant proposed to her that he would get the keys to the car from his friend and carry her home if she so desired. She accepted this proposal of the defendant. They started home on a hard-surfaced highway. A short distance from Maluda's the defendant abruptly turned to the right off the pavement onto a side road or curve about one mile long, which had been left out when the road was paved. This was known as Dead Man's Curve. The defendant, at the curve of this side road, drove to the edge of it and stopped his car, over the protest of the female. The female inquired of the defendant why he took this side road and he stated that he wanted to talk to the female about her sister, with whom he had formerly gone. Instead of doing this, he proposed intercourse with the female. She refused him and requested that he take her home. Thereupon, the defendant partly removed his clothes and hers and sought by force to know her carnally. She made an outcry. She resisted by moving about

in the seat of the car. She kicked him on the shin and skinned it considerably. She became almost completely exhausted by resisting him. Then it was that a car going in the same direction on the curve approached the car which the defendant and the female occupied. During the struggle between the defendant and the female, the defendant in an effort to get the female in a prone position in the front seat of the car, had pushed her under the steering wheel. When the car approached from the rear, the defendant jumped out of the car, ran around the back to the side of the steering wheel, opened the door and started the car off at such a rapid rate of speed that the back wheels of the car tore up and scattered the soil to a considerable extent. After the defendant had started the car he slowed it down for the car behind him to pass. The car did not pass. One of the men in the car behind procured the license number of the defendant's car. He did not recognize the defendant nor the female. It developed that the number taken down was that of the car in which the defendant and the female were riding. The defendant thereafter carried the female home and put her out. She was crying, ran into the house and informed her family as to what happened. The same night one of the brothers of the female visited Dead Man's Curve and found that the defendant had driven the car hurriedly from the spot, corroborating the evidence of the female. The next day the father of the female and the sheriff visited the place and further corroborated the evidence of the female. It will thus be seen that insofar as the general grounds are concerned, the evidence amply sustains the verdict. The testimony of the female was corroborated by all of the incidents above related. There was no other evidence for the State as to what happened at the time of the attack.

The defendant made a statement as to what happened at the scene of the attack and corroborated the evidence of the female and of that in corroboration of her evidence to the effect that he did turn off the highway; that he did get out of the car; that he proposed intercourse with her, but he testified also that she consented and that at the time the car drove up behind them he was on the ground with his arm around the female; that there was no scratching or kicking or resisting whatsoever; and that while he was thus on the ground with the female, the car drove

up behind them and he and the female re-entered the car; that he did not speed the car off, but that it had rained and the ground was soft, which produced the evidence which indicated that the car had speeded. We might state here that the witnesses for the State who examined the spot of ground where the attack was alleged to have occurred testified that they found no imprint of female tracks on the ground, but that they did find imprints of a man's tracks. The evidence amply sustains the verdict on the general grounds and there is no merit in the assignments of error based thereon.

■ We come next to consider the motion which forms the basis of the exceptions pendente lite. In discussing the assignments of error on the exceptions pendente lite we will discuss these assignments together with special grounds 2, 3, and 4, because the special grounds and the motion relate to the same subject-matter. We will not go into detail as to the allegations of the motion and the proof in support of it, nor as to the details in special grounds 2, 3, and 4. We will only state that these assignments of error may easily be divided into two divisions: First, as to what took place while the defendant and the female were sitting in the car in front of Maluda's cafe. Witnesses for the defendant testified that they saw the defendant and the female caressing and embracing to a disgraceful extent. The purpose of this testimony could only be admissible for the consideration of the jury as a circumstance for the jury to consider as to whether the female gave her consent for the defendant to do what he was alleged to have done forcibly and against the will of the female after they left Maluda's cafe. It could not legally have been admissible for any other purpose. It is an elementary principle of law that a female of the most depraved character (and there is no evidence in this case to show that the female here was depraved by general reputation or otherwise), may be the subject of carnal knowledge of her forcibly and against her will. The jury gave no credence to this phase of the defendant's testimony. Such evidence of the conduct of the female and the defendant in front of Maluda's cafe was produced by the defendant himself, by his own witnesses. So this phase of it has no merit.

Second, the motion not to pass judgment, etc., and special

grounds 2, 3, and 4, attack the conviction on the ground that the verdict was procured by fraud on the part of the State for that the conduct of the father and the brothers of the female in talking with and threatening the defendant's witnesses before and after they had been subpoenaed constituted acts of contempt of the court. It appears to us that this was an entirely different case from the question as to whether or not the jury were authorized to find, under the evidence, that the defendant was guilty of assault with intent to rape. It is claimed that the father and the brothers talked to the defendant's witnesses and inquired of them as to what they would testify, informing the witnesses that they would be expected to tell the truth and nothing more, and that if they told anything other than the truth on the female it might not be good for them. The defendant produced the witnesses on this point and brought out on cross-examination certain evidence pertaining to it. The jury heard it all. The witnesses themselves testified that they did tell the truth on the stand and that the conversation had with relatives of the female had nothing to do with what they testified at the trial. The witnesses for the State testified that they did talk with the defendant's witnesses, but that they did not endeavor to influence them as to what the defendant's witnesses should testify at the trial other than that such witnesses would be expected to tell the truth. In this view the court did not err in overruling the motion, nor in overruling special grounds 2, 3, and 4. All of this was brought out during the trial in the presence of the court and jury. In the face of it the jury returned a verdict of guilty against the defendant. The court accepted this verdict as being the truth of the case. So far as we know the court did not then and has not since arraigned any of the parties referred to for conduct amounting to contempt of court. This is the province of the trial court. This is true notwithstanding the fact that the attorney for the defendant during the progress of the trial admonished the court to take note that the conduct of the relatives of the female was such conduct as amounted to contempt of court. There is no reversible error in these assignments.

■ Special ground 1 assigns error because while the prosecutor, the father of the female, was on the stand, he illegally

testified in detail as to the statement made by the female not in the presence of the defendant, whereupon counsel for the defendant objected to the admission of such statements and asked that they be ruled out. By an examination of this ground of the motion it appears that the witness testified in response to a question from the solicitor-general as to where the witness went, the witness replying substantially that he and his son got up early the next morning after the alleged attack and drove out to the place where the female had said that the attack occurred; that the female was so excited that she could not give an exact description of the place where the attack occurred, but that she thought it was called Dead Man's Curve. Then counsel for the defendant stated: "I object to that and ask the court to rule it out. That is contrary to law and objectionable from every standpoint." The court admonished the witness: "Don't state that." Whereupon the solicitor-general said: "Well, that is not admissible. Just leave out what she said." If counsel for the defendant was not satisfied with this ruling, he should have so stated then and invoked a further and more specific ruling. In such event no doubt the trial court would have ruled more specifically. The solicitor-general occupied a quasi-judicial position in the performance of his duty and his statement to the effect that such testimony was not admissible may further be considered in this connection as to whether the court's ruling and the solicitor-general's statement were sufficient to eliminate any harm that probably might have been done to the defendant. This ground does not require a reversal.

Counsel for the defendant cites no authority in support of his contentions. We do not think it either needful or beneficial for us to cite any authority.

The court did not err in overruling the amended motion for a new trial for any of the reasons assigned.

*Judgment affirmed. MacIntyre, P.J., and Townsend, J., concur.*